UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GRANT GAMBAIANI, M16623,

                   Petitioner,

     v.

BRITTANY GREENE, Warden, Western
Illinois Correctional Center,

                   Respondent.

No. 21 C 05142

Judge Thomas M. Durkin

**MEMORANDUM OPINION AND ORDER**

Petitioner Grant Gambaiani is a state prisoner currently serving an aggregate prison sentence of 34 years. He seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254, alleging that his right to a public trial under the Sixth Amendment was violated and that he received ineffective assistance of counsel during plea negotiations. R. 1, 60. Respondent argues that Petitioner's Sixth Amendment claim is procedurally defaulted and that both claims fail on the merits. R. 34. For the following reasons, the petition is denied, but the Court issues a certificate of appealability on the issue of Petitioner's Sixth Amendment claim only.

**Background**

In his 28 U.S.C. § 2254 petition, Petitioner challenges his convictions for three counts of predatory criminal sexual assault of a child, one count of aggravated criminal sexual abuse, and one count of manufacturing child pornography. The petition alleges two grounds for relief: (1) Petitioner was denied his Sixth Amendment right to a public trial when the trial court closed the courtroom during D.G.'s

1

testimony, and (2) Petitioner's attorneys during his first trial were ineffective by failing to inform him that if he rejected the State's initial plea offer, went to trial, and was convicted, he would be subject to mandatory consecutive sentencing. R. 1.

## I.    State Trial Court Proceedings

### a. Petitioner's First Trial and Appeal

In June 2008, D.G., a 10-year-old boy, told his parents, a clinical psychologist, and investigators that he had been having sexual relations with Petitioner, his 24-year-old cousin, between March and June of that year. *People v. Gambaiani*, 2016 IL App (2d) 140124-U, at ¶ 2. In July 2008, Petitioner was arrested, and police took custody of his cell phone and computer. *Id.* While in pretrial custody, D.G.'s father talked to Petitioner and urged him to "come clean." R. 15-11 at 3734. During an interview with police, Petitioner confessed to touching D.G.'s genitalia and performing oral sex on him (and D.G. reciprocating), anally penetrating D.G., showing D.G. pornographic images, using his phone to take photos of D.G.'s genitalia, drafting a list of "sexual things" he wanted to do with D.G., and possessing other pornographic photos of minors. *Id.* at 3718–30.

He was charged with four counts of predatory criminal sexual assault of a child, a Class X felony, one count of manufacturing child pornography, a Class 1 felony, and one count of aggravated criminal sexual abuse, a Class 2 felony. *People v. Gambaiani*, 2020 IL App (2d) 190372-U, at ¶ 4. Petitioner hired attorneys Kevin Halverson and Elliot Samuels to defend him, and after he rejected an initial plea deal of pleading guilty to one Class 1 felony in exchange for a sentence of 4 to 15 years,

the case went to trial. *Id.* ¶ 5. The jury found Petitioner guilty on all counts, and the court sentenced him to a total of 43 years in prison. *Id.* ¶ 6. Petitioner took an appeal. On appeal, the Illinois Appellate Court found that the State had committed a discovery violation by withholding exculpatory information from Petitioner and his lawyers. *People v. Gambaiani*, 2012 IL App (2d) 101246-U, ¶ 1. The appellate court reversed Petitioner's convictions and remanded for a new trial. *Id.*

### b. Petitioner's Retrial

On remand, the State offered Petitioner a plea deal of 25 years imprisonment, which he rejected. *Id.* ¶ 7. Petitioner fired Halverson and Samuels and hired attorney Stephen Brundage to represent him in the retrial. *Id.* The jury returned a verdict of guilty on all counts but one predatory criminal sexual assault of a child charge. *Id.* The trial court sentenced Petitioner to an aggregate term of 34 years in prison, which was the sum of nine-, nine-, and ten-year mandatory consecutive sentences for the three predatory criminal sexual assault convictions, consecutive to six years for manufacturing child pornography.[1] R. 15-11 at 4122–23. Under 730 ILCS 5/3-6-3, Petitioner is required to serve 85% of his sentence, rather than the typical 50%. *Gambaiani*, 2020 IL App (2d) 190372-U, at ¶ 7.

On direct appeal, Petitioner argued in part that the trial court deprived him of his Sixth Amendment right to a public trial when it closed the courtroom during D.G.'s testimony. *Gambaiani*, 2016 IL App (2d) 140124-U, at ¶ 16. As described in more detail below, the appellate court rejected this argument. The appellate court

---

[1] The sentences for the remaining convictions run concurrently.

reversed on other grounds Petitioner's convictions for possession of child pornography. *Id.* ¶ 1. This did not affect his overall sentence, however, because the sentences for these convictions were concurrent with other sentences. *Gambaiani*, 2020 IL App (2d) 190372-U, at ¶ 8. Petitioner raised his Sixth Amendment argument in a petition for leave to appeal ("PLA") to the Illinois Supreme Court. R. 15-6. The Supreme Court denied his petition. *People v. Gambaiani*, 80 N.E.3d 4 (Ill. Mar. 29, 2017).

## II.    Postconviction Proceedings

In December 2017, Petitioner filed a postconviction petition for relief, alleging that his first set of attorneys, Halverson and Samuels, were ineffective for failing to inform him that he was subject to mandatory consecutive sentencing on his predatory criminal sexual assault counts if he elected to go to trial and lost. *Gambaiani*, 2020 IL App (2d) 190372-U, at ¶ 9. He also alleged that Samuels incorrectly informed him that he would likely only receive probation. *Id.* He argued that, but for his attorneys' mistakes, he would have accepted the first plea offer of 15 years. *Id.* As explained in depth below, the trial court held an evidentiary hearing and denied his petition. *Id.* ¶ 2. The appellate court upheld the trial court's denial of the petition. *Id.* Petitioner renewed his claim in a PLA to the Illinois Supreme Court, which it denied. *People v. Gambaiani*, 80 N.E.3d 4 (Ill. 2021).

## Legal Standard

"Federal habeas relief from a state-court criminal judgment is not easy to come by." *Thompkins v. Pfister*, 698 F.3d 976, 983 (7th Cir. 2012). When a state court has

adjudicated a federal claim on the merits, a federal habeas court may not grant relief unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court's decision is contrary to clearly established Supreme Court law "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to" that reached by the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 404–05 (2000). To prove that a state court unreasonably applied clearly established law, the petitioner must demonstrate "that the state court's ruling on the claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Warren v. Baenen*, 712 F.3d 1090, 1096 (7th Cir. 2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)); *see also Shinn v. Kayer*, 141 S. Ct. 517, 520 (2020). And "a decision involves an unreasonable determination of the facts if it rests upon fact-finding that ignores the clear and convincing weight of the evidence." *Goudy v. Basinger*, 604 F.3d 394, 399–400 (7th Cir. 2010) (citing *Ward v. Sternes*, 334 F.3d 696 (7th Cir. 2003)).

For a federal district court to conduct *habeas* review, the petitioner must have first presented his federal claims at each level of the state court. 28 U.S.C. § 2254(b). A "petitioner who has exhausted his state court remedies without properly asserting his federal claim at each level of state court review has procedurally defaulted that

claim." *Lewis v. Sternes*, 390 F.3d 1019, 1026 (7th Cir. 2004). A claim can be procedurally defaulted when it is denied by the state court "based on an adequate and independent state procedural rule." *Davila v. Davis*, 582 U.S. 521, 527 (2017).

## Discussion

### I. Sixth Amendment Right to a Public Trial

Petitioner first argues that he was denied his Sixth Amendment right to a public trial because the state trial court arbitrarily closed the courtroom to the public during D.G.'s testimony, and that the state appellate court's ruling on this issue was contrary to and involved an unreasonable application of clearly established federal law and was based on an unreasonable determination of the facts.

#### A. Relevant Facts

##### i. Trial Court Proceedings

Prior to Petitioner's first trial, the State filed a motion *in limine* to close the courtroom pursuant to 725 ILCS 5/115-11 during D.G.'s testimony to anyone but the media and those with a direct interest in the case. R. 15-9 at 1010–13; *see* 725 ILCS 5/115-11 (in certain sex offense cases, the trial court may "exclude from the proceedings while the [minor] victim is testifying, all persons, who, in the opinion of the court, do not have a direct interest in the case, except the media."). Defense counsel responded, "the statute says what the prosecution says it says. . . . I think it's a constitutional right to open a public trial; it's a very important right and the Court has discretion in this matter," and then requested that Petitioner's father stay in the courtroom. R. 15-9 at 1011. The court granted the State's motion. *Id.* at 1013.

Prior to the retrial, the State did not file another motion *in limine* to close the courtroom during D.G.'s testimony. Rather, the morning before jury selection, the prosecutor stated, "when the victim does testify, he's still under 16 and under ILCS 5/115-11, the courtroom should be cleared of any uninterested parties other than the media while he testifies." R. 15-10 at 2793. Defense counsel then asked whether "that would include all individuals except the media, everyone, all family members[?]" *Id.* The court replied that only those "who in the opinion of the court do not have a direct interest in the case" would be excluded. *Id.* Defense counsel then asked for a preemptory ruling that Petitioner's father would be allowed to be present during D.G.'s testimony. *Id.* The court replied that it "would tend to think family members from either side would come under direct interest in the case." *Id.* at 2793–94. The prosecutor agreed, and the court found that Petitioner's father had a direct interest in the case and would be allowed to remain in the courtroom. *Id.* at 2794.

Later, when D.G. was called to the stand and while the jury was impaneled, the prosecutor approached the judge at a side bar and stated that he "forgot to clear the courtroom" and noticed two people who were not family members present in the courtroom. R. 15-11 at 3313. The court called both parties to the side bar. *Id.* The court determined that neither spectator was with the press—one was a student and the other was a judicial law clerk. *Id.* at 3313–14. They were either asked to leave the courtroom or left of their own accord. *Id.* at 3314. The court then requested that the prosecutor tell "the deputies . . . not to let anybody in." *Id.* D.G. then took the stand

and testified as to Petitioner's advances and conduct toward him while on family trips and while Petitioner was babysitting him.

### ii. Appellate Court Ruling

In denying Petitioner's Sixth Amendment argument on appeal, the Illinois Appellate Court first found that defense "counsel's statement acquiescing to the courtroom's closure waived the issue for review." *Gambaiani*, 2016 IL App (2d) 1401124-U, at ¶ 16. It is unclear to which statement the appellate court referred. The court distinguished its finding of waiver from an "ordinary forfeiture of a claim. . . . [which] is basically an oversight in preserving a claim." *Id*. The appellate court stated that Petitioner instead made "a deliberate decision to abandon a right," which meant that the court could not overlook the decision to conduct plain error analysis. *Id*. (citing *United States v. Olano*, 507 U.S. 725, 732–34 (1993); *People v. Townsell*, 209 Ill. 2d 543, 548 (2004); and *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004)).

The court further observed that Petitioner's claim lacked merit because, "unlike a complete mandatory closure, which indiscriminately excludes the general public and so is unconstitutional," a closure made pursuant to "725 ILCS 5/115-11 is limited in scope; it applies only to the victim's testimony in sex-offense cases, and does not exclude the media and those directly interested in the case." *Id*. ¶ 17. And because Petitioner had not shown that anyone was improperly excluded, "none of the evils of a closed trial were implicated" and Petitioner was not denied his Sixth Amendment right to a public trial. *Id*.

The appellate court did, however, note that the trial court's procedure for closing the courtroom was "highly objectionable" and "not the ideal way to handle" it. *Id.* ¶ 19. For example, the trial court "deputized" the prosecutor in front of the jury by giving him the authority to clear the courtroom and to tell bailiffs not to let anyone in, which, "in another case . . . could easily be a bridge too far." *Id.* Further, telling deputies to not let anyone in the courtroom once D.G.'s testimony started may have blocked media or other interested parties who attempted to come in late. *Id.* ("Closing a public hearing like a trial should not be done lightly, and the proper course would have been to direct the bailiff to signal if anyone attempted to enter and then determine on a case-by-case basis whether the person should be permitted to enter." (quoting *People v. Burman*, 986 N.E.2d 1249, 1260 (Ill. App. Ct. 2013))).

### B. Analysis

#### i. Procedural Default

The parties disagree as to the practical effect of the Illinois Appellate Court's finding of waiver. According to Respondent, the appellate court held that Petitioner waived any objection to the trial court's actions, and therefore Petitioner's argument here is procedurally defaulted on an adequate and independent state ground. But according to Petitioner, the appellate court did not hold that he *procedurally* forfeited the claim, but rather, *substantively* and affirmatively waived his Sixth Amendment right to a public trial, which is a federal question and must be examined on the merits.

Petitioner is right. Citing the United States Supreme Court's decision in *Olano*, the appellate court specifically distinguished its holding that Petitioner had waived

the public trial issue from a forfeiture of a claim. As the Court explained in *Olano*, "[w]hereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.'" 507 U.S. at 733 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). And opposed to "an oversight in preserving a claim," or the absence of "a trial objection [or] a written post-trial motion raising the issue," which constitutes a forfeiture, *Gambaiani*, 2016 IL App (2d) 140124-U, at ¶ 16 (quoting *People v. Enoch*, 122 Ill. 2d 176, 186 (1988)), the appellate court stated in no uncertain terms that Petitioner made "a deliberate decision to abandon" his right to an open trial. *Gambaiani*, 2016 IL App (2d) 140124-U, at ¶ 16.

The appellate court's finding of waiver in this case was not based on an independent state ground because it was intertwined with federal law. This Court must "presume that there is no independent and adequate state ground for a state court decision when the decision 'fairly appears to rest primarily on federal law, or to be interwoven with the federal law with the federal law,'" or when it is not otherwise "clear from the face of the opinion." *Coleman v. Thompson*, 501 U.S. 722, 735 (1991) (quoting *Michigan v. Long*, 436 U.S. 1032, 1040–41 (1983)). Though the appellate court here did not do an in-depth analysis, it appears that its decision relied on both federal and state law regarding an affirmative waiver of a constitutional right. Indeed, the appellate court relied on United States Supreme Court precedent in reaching its decision. *Gambaiani*, 2016 IL App (2d) 140124-U, at ¶ 16 (citing *Olano*, 507 U.S. at 732–34). Further, "[t]he question of an effective waiver of a federal

constitutional right in a proceeding is of course governed by federal standards." *Boykin v. Alabama*, 395 U.S. 238, 243 (1969); *see also Olano*, 507 U.S. at 732–34 (describing the test for determining whether a particular constitutional right is waivable). And in any case, any ambiguity is construed in favor of the petitioner. *Coleman*, 501 U.S. at 735; *Richardson v. Lemke*, 745 F.3d 258, 269 (7th Cir. 2014) ("We do not construe genuine ambiguity in favor of the state[.]").

The cases cited by Respondent all examined state court findings of forfeiture where the petitioners failed to object during trial or failed to preserve or present an issue on appeal. The source of Respondent's mix-up seems to be that forfeiture is also sometimes confusingly referred to as a "waiver" of an issue. For example, the court in *Kaczmarek v. Rednour*, 627 F.3d 586, 591–92 (7th Cir. 2010) determined that a claim was procedurally defaulted under an adequate and independent state ground because the petitioner failed to preserve an issue for appeal by not objecting to the error at sentencing. Though the Seventh Circuit labeled the procedural default in that case as a "waiver," it is clear it was talking about forfeiture because the court conducted plain error review, which is available when a claim is forfeited, but not when a right is waived. *See, e.g.*, *Olano*, 507 U.S. at 733–34; *Townsell*, 209 Ill. 2d at 548. Similarly, in *Coleman v. O'Leary*, 845 F.2d 696, 699–700 (7th Cir. 1988), the Seventh Circuit found a procedural default because the state appellate court relied on the doctrine of forfeiture (which it labeled "waiver") in dismissing a trial court error because the defendant failed to object to that error during trial. *See also People v. Radford*, 181 N.E.3d 78, 83 (Ill. 2020) (conducting plain error review on right to a public trial claim

11

because the defendant failed to preserve the error by objecting during trial or raising it in his posttrial motion). And in the one non-*habeas* case cited by Respondent that discussed both a procedural and an "affirmative[ ] and voluntar[y] waive[r]" of the right to a public trial, the Illinois Appellate Court discussed federal law in determining whether the waiver of the right was effective. *People v. Webb*, 267 Ill. App. 3d 954, 958–59 (1994) (discussing *Martineau v. Perrin*, 601 F.2d 1196 (1st Cir. 1979)).

The Illinois Appellate Court's finding of waiver thus does not lead to a procedural default of Petitioner's right to a public trial claim. The Court finds it unnecessary to fully address whether the appellate court's finding that Petitioner waived his right to a public trial involved an unreasonable application of the law and an unreasonable determination of the facts,[2] because, even if Petitioner had not waived his right to a public trial, this right was nonetheless not violated.

### ii. Whether the Closure of the Courtroom Violated Petitioner's Right to a Public Trial

---

[2] Here, when the prosecutor stated the courtroom "should" be closed to everyone but those with a direct interest in the case or the media, Petitioner's attorney replied by clarifying the effect of the statute, R. 15-10 at 2793 ("So that would include all individuals except the media, everyone, all family members[?]"), and requesting that Petitioner's father be allowed to remain in the courtroom. *Id.* Given the requirement that the Court indulge "every reasonable presumption against" waiver of the public trial right, *Walton v. Briley*, 361 F.3d 431, 433–34 (7th Cir. 2004) (quoting *Hodges v. Easton*, 106 U.S. 408, 412 (1882)), his counsel's statement asking the court to make a finding that Petitioner's father was a directly interested party is likely not enough to reasonably find an affirmative waiver. *Cf. Webb*, 267 Ill. App. 3d at 958–59 (finding waiver of public trial right where judge asked defense counsel, "Are you satisfied in your's [sic] client's right to a public trial?" and attorney responded, "Yes, judge.").

The Sixth Amendment to the United States Constitution provides an accused the right to a "speedy and public trial." This provision is designed to protect an accused's right to a fair trial; ensure that the prosecution and trial judge carry out their duties responsibly; encourage witnesses to come forward; and discourage perjury. *Waller v. Georgia*, 467 U.S. 39, 46 (1984). It also "satisf[ies] the appearance of justice," which inspires public trust in the criminal process and allows it to work effectively. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 571–72 (1980). "[B]efore excluding the public from any stage of a criminal trial," *Presley v. Georgia*, 558 U.S. 209, 213 (2010), the trial court must assure that the closure of the proceeding satisfies the standard laid out by the Supreme Court in *Waller*, which includes making adequate findings on the record that there is "an overriding interest that is likely to be prejudiced," the closure is "no broader than necessary to protect that interest," and that the court considered "reasonable alternatives to closing the proceeding." 467 U.S. at 47–48. A defendant need not prove any "specific prejudice in order to obtain relief for a violation of the public-trial guarantee." *Id.* at 49.

The Illinois Appellate Court held that, even if it could consider Petitioner's Sixth Amendment claim, a partial courtroom closure under 725 ILCS 5/115-11 does not implicate the Sixth Amendment or *Waller* the way a full courtroom closure does. Instead, under § 5/115-11, the courtroom is partially closed only during the minor victim's testimony, and only to those with no direct interest in the case and who are not a member of the media. Though *Presley* is clear that the *Waller* standard applies to a closure during "any stage" of a criminal trial (even a portion of it), the United

13

States Supreme Court has never directly addressed whether it applies to such limited closures during which at least some spectators and the media are allowed to remain. *See generally Presley*, 558 U.S. at 213–14 (addressing total closure of courtroom during jury selection); *Waller*, 467 U.S. at 42 (addressing total closure of pretrial suppression hearing). Therefore, this portion of the appellate court's holding was not contrary to "clearly established" Supreme Court law, which is required to receive *habeas* relief. *Williams*, 529 U.S. at 381 (the Supreme Court must "br[eak] sufficient legal ground to establish" that a right applies to a given situation to receive habeas relief).

Petitioner argues that the appellate court's holding is unreasonable because the trial court did not actually follow the dictates of 725 ILCS 5/115-11, causing an inadvertent full closure to occur. In Petitioner's second trial, the trial court, after ordering those non-media spectators without a direct interest in the case to leave, ordered the bailiffs (through the prosecutor), to prevent anyone from coming in the courtroom once D.G.'s testimony started. Therefore, the argument goes, the courtroom was *fully* closed to anyone who attempted to come in *after D.G.'s testimony began*. According to Petitioner, the trial court should therefore have applied *Waller*, and because it did not,[3] his right to a public trial was violated. But Petitioner does

---

[3] Applying *Waller*, the protection of D.G. would likely justify closing the courtroom given the subject matter of the trial and D.G.'s age. *Press–Enterprise Co. v. Sup. Ct.*, 478 U.S. 1, 9 n.2 (1986) (noting that "[t]he protection of victims of sex crimes from the trauma and embarrassment of public scrutiny may justify closing certain aspects of a criminal proceeding"). The closure during D.G.'s testimony only, and the ability of directly interested persons to stay, means the closure was likely narrowly tailored to

not carry his heavy burden of proving that the appellate court's holding that the closure did not implicate *Waller* "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Warren*, 712 F.3d at 1096 (quoting *Harrington*, 131 S.Ct. at 778).

For example, in *United States v. Anderson*, the Seventh Circuit held that short, non-essential portions of a trial being held after the courthouse closed each day did not violate the defendant's public trial right because spectators were not totally barred (for example, spectators who were already in the courthouse when the courthouse closed could attend the trial), and because the defendant had no evidence that any spectators actually tried to attend and were excluded. 881 F.3d 568, 573–74 (7th Cir. 2018). The Seventh Circuit contrasted this with *Walton*, a case in which it held that the defendant's Sixth Amendment rights were violated when the entirety of the trial was held while the courthouse was closed, and the defendant's fiancé twice attempted to attend the trial but was unable. *Id.* at 432. Here, like in *Anderson*, there was not a total bar of spectators. The only person Petitioner requested to be able to attend, his father, was allowed to stay during D.G.'s testimony. The trial court questioned spectators to ensure that any media or people with a direct interest in the case who were in the courtroom at that time were able to remain. And Petitioner has provided no evidence (whether in the record, or by way of affidavit) that anyone—

---

protecting D.G. The problem is that the trial court did not make findings on the record or seem to consider alternatives to closure, which are both required under *Waller*.

whether media or not—tried to attend the trial during D.G.'s testimony and was actually barred. *Anderson*, 881 F.3d at 575 ("[W]e are not presented with a case in which friends or relatives of the defendant, or anyone else for that matter, were actually excluded.").

The appellate court's holding that the closure which occurred here did not undermine the values furthered by the public trial right is also reasonable. When some spectators, such as family members, are still allowed in the courtroom, it mitigates the concerns that arise during a totally closed proceeding, such as ensuring the judge and prosecutor are fair, witnesses are telling the truth, and the public trusts in the criminal justice process. And "in assessing the values protected by the right to a public trial, it [i]s 'not without significance' that the exclusion did not involve a relative or friend of the defendant." *Id.* (quoting *Braun v. Powell*, 227 F.3d 908, 919 (7th Cir. 2000)); *see also Judd v. Haley*, 250 F.3d 1308, 1315 (11th Cir. 2001) ("When access to the courtroom is retained by some spectators (such as representatives of the press or the defendant's family members), . . . the impact of the closure is not as great, and not as deserving of such a rigorous level of constitutional scrutiny."); *United States v. Osborne*, 68 F.3d 94, 98 (5th Cir. 1995) ("[B]ecause an audience remains to ensure the fairness of the proceedings," a partial closure "does not raise the same constitutional concerns as a total closure.").

Petitioner also argues that the appellate court's holdings are directly at odds with the Supreme Court's decision in *Globe Newspaper Co. v. Sup. Ct. for Norfolk Cnty.*, 457 U.S. 596 (1982). In that case, the Court held that a state statute *mandating*

16

the exclusion of anyone without a direct interest in the case for the entirety of a trial involving a minor victim of a sex offense violated the First Amendment freedom of the press to attend the trial. *Id.* at 610–11. Petitioner likens the circumstances in *Globe* to those which occurred here. In Petitioner's trial, the prosecution relied on the victim being under 18 years of age as its only justification for employing 725 ILCS 5/115-11, and erroneously stated to the court that closure was necessary, rather than permissive, under the statute. R. 15-10 at 2793 ("When the victim does testify, he's still under 16 and under ILCS 5/155-11, the courtroom *should* be cleared…") (emphasis added). But the facts in *Globe* are still distinguishable. *Williams v. Taylor*, 529 U.S. 362, 404–05 (2000) (to qualify for relief, habeas petitioner must show state court's ruling was at odds with a "materially indistinguishable" Supreme Court case).[4] In that case, the media attempted to attend the trial and were prevented from doing so. 457 U.S. at 599–600. Indeed, the newspaper filed multiple motions and petitions with the court to open proceedings for the media, which the court denied. *Id.* No such closure to the media occurred here—instead, the trial court questioned all spectators to ensure that anyone with the media *could* stay in the courtroom during D.G.'s testimony. And though it is true that the bailiffs had been instructed

---

[4] It does not matter that *Globe* was a First Amendment rather than a Sixth Amendment case. *Waller* cited *Globe* to explain that a criminal defendant's right to a public trial under the Sixth Amendment is at least coextensive with the right of the press to attend a trial. *Waller*, 467 U.S. at 46 ("There can be little doubt that the explicit Sixth Amendment right of the accused is no less protective of a public trial than the implicit First Amendment right of the press and public."); *Presley*, 558 U.S. 209, 213 (2010) ("there is no legitimate reason . . . to give one who asserts a First Amendment privilege greater rights to insist on public proceedings than the accused has.").

not to let anyone in once D.G. started testifying, once again, Gambaiani has not identified any evidence of a single person who attempted to attend the trial during D.G.'s testimony and was excluded.

Though it is a close question, especially given the "highly objectionable" manner in which the trial court carried out 725 ILCS 5/115-11 (*Gambaiani*, 2016 IL App (2d) 140124-U, at ¶ 16), and the prosecutor's erroneous statements about the mandatory nature of the closure, Petitioner has not shown that the appellate court's holding that Petitioner's Sixth Amendment rights were not violated is contradictory to, or involved an unreasonable application of, clearly established Supreme Court precedent, and therefore, cannot support *habeas* relief.

## II.     Ineffective Assistance of Counsel

Petitioner next argues that he was denied the right to the effective assistance of counsel during plea negotiations because his first set of attorneys, Samuels and Halverson, failed to inform him that he was subject to mandatory consecutive sentencing on his Class X felony charges. As a result, he claims he rejected the State's initial plea offer which he would have otherwise accepted. He also claims the state appellate court's rejection of his ineffective assistance of counsel claim was based on an unreasonable determination of the facts.

### A. Relevant Facts

Nearly ten years after the initial plea negotiations in his criminal case, Petitioner filed a post-conviction petition alleging ineffective assistance of counsel during plea negotiations. On March 21, 2019, the trial court held an evidentiary

hearing at which both Halverson and Samuels testified. The following facts are drawn from the transcript of that hearing.

### i. Plea Negotiations

Samuels testified that he had worked as a defense attorney for over 40 years and had represented "thousands" of criminal defendants. R. 15-11 at 4142, 4184. He explained that Petitioner's father hired him after Petitioner was arrested, and that, at the time, he believed Petitioner faced four Class X charges of "aggravated criminal sexual abuse," (he was actually charged with predatory criminal sexual assault). *Id.* at 4144; R. 15-3 ¶ 10.

At Petitioner's initial court appearance in July 2008, the judge informed Petitioner that predatory criminal sexual assault was a Class X felony and that the minimum sentence if convicted was six years, and the maximum sentence was 30 years. R. 15-11 at 4308. Petitioner testified that, during his initial meeting with Samuels to discuss the case, Samuels told him that he would "never do any jail time" and was a "good candidate for probation" because he was a first-time offender, there was only one victim, and D.G.'s family was receptive to him receiving probation. *Id.* at 4280–81. Conversely, Samuels testified that Petitioner told him during their initial meeting that the whole thing was a "big misunderstanding" and that he had only playfully wrestled with D.G., and nothing else had occurred. R. 15-3 ¶ 10. Based on these statements, Samuels stated that he opined that Petitioner "wouldn't have to worry about going to jail." R. 15-11 at 4145. But once Samuels received and examined the discovery documents and the extent of the credible evidence against Petitioner,

19

he realized the State's case was much stronger than Petitioner initially had led him to believe. *Id.* at 4190. Samuels then hired Halverson to assist with the defense. R. 15-3 ¶ 10. He initially denied having referred Petitioner for sex offender treatment, but later admitted he had when he was shown documents confirming such. R. 15-11 at 4146.

Halverson testified that he had 13 years of experience as a prosecutor and defense attorney. R. 15-3 ¶ 12; R. 15-11 at 4198–99, 4209. He first met with Petitioner in December of 2008 and informed him of his sentencing exposure on each charge. *Id.* He explained that his usual practice at his initial client meetings was to discuss the mandatory sentencing range the client faced and whether the offenses were subject to consecutive sentencing. R. 15-11 at 4219.

In January 2009, the parties reported pursuing plea negotiations. R. 15-12 at 5. Samuels testified that his strategy was "to get the State to reduce the level of the offenses" since Petitioner "was charged with . . . non-probationable Class X crimes." R. 15-11 at 4150. In July 2009, Samuels submitted a mitigation proposal that argued that Petitioner should be offered a plea to a probationable Class 1 felony offense. *Id.* at 4189–90; R. 15-3 ¶ 11. On July 16, 2009, the State offered Petitioner the opportunity to plead guilty to a non-probationable Class 1 felony, which carried a sentence of four to 15 years to be served at 50%, in exchange for the State dismissing the remaining charges. R. 15-3 ¶¶ 5, 11. Petitioner had one day to accept. R. 15-11 at 4290–91.

That day, both Samuels and Halverson met with Petitioner to discuss the offer, while Petitioner's father called in via telephone for a portion of the meeting. R. 15-3 ¶ 11. Samuels and Halverson both testified that Halverson explained to Petitioner the mandatory sentences if he was found guilty of all the charged offenses, including "the various sentencing options that could be imposed," that the sexual assault charges carried a "statutory mandatory requirement . . . that those sentences would run consecutively," and that he could face a mandatory minimum of 24 years to be served at 85% on the four Class X counts. R. 15-11 at 4161–62, 4185–86. Halverson and Samuels stated that they ran through examples of scenarios. For example, Samuels stressed to Petitioner that even if he beat three out of the four Class X charges, he still risked receiving a sentence "far greater than the maximum sentence on the State's offer (15 years at 50%)" if he decided to go to trial. *Id.* at 4162–63; R. 15-3 ¶ 11. Halverson noted that if Petitioner were convicted of two Class X charges, his minimum sentence, 10.5 years (two six-year consecutive sentences served at 85%), would be more than the maximum sentence he would serve on accepting the plea deal, 7.5 years (15 years served at 50%). R. 15-11 at 4206. Samuels also brought up the cache of child pornography found on Petitioner's computer. According to Samuels's recollection at the evidentiary hearing, Petitioner faced "kiddie porn counts," (though it was not until September 10, 2009, after the July 2009 meeting that the superseding indictment that included the child pornography counts against Petitioner was filed). *Id.* at 4186. Samuels testified that he warned Petitioner that no jury would acquit him after hearing the child pornography evidence. Samuels and

21

Halverson therefore both recommended taking the plea offer, given the "consecutive nature of the offenses." *Id.* at 4192.

Nonetheless, Petitioner rejected the offer. *Id.* at 4162. Both Samuels and Halverson testified that Petitioner was "adamant" that he would not accept an offer than involved jail time. *Id.* at 4162–63 (Petitioner was "emphatic that he would not agree to any jail time"); *id.* at 4222 (Petitioner was "adamant" about wanting an "offer that would be probation with no jail time"). Samuels testified that he warned Petitioner the State's offer was "take-it-or-leave-it," and that if he rejected it, "it's gone forever." *Id.* at 4162–63. Petitioner's father disagreed and stated that "there is no such thing as an end to negotiations." *Id.* at 4163–64.

In December 2009, Halverson drafted a memo for the case file regarding this meeting. *Id.* at 4211–12. R. 15-13 at 96–97. Samuels testified that it was Halverson's idea to draft the memo, because, in Halverson's experience as a prosecutor, criminal defendants frequently allege they were not given the opportunity to plead guilty. R. 15-11 at 4173–74. Halverson testified that it was Samuels who recommended he prepare the memo, and that he never imagined a client would falsely accuse him of not giving certain advice. *Id.* at 4212. Regardless, the memo stated that Halverson and Samuels advised Petitioner to accept the plea offer because "he would likely receive . . . an IDOC sentence," and because the plea deal was a "good offer . . . given the nature of the charges and the strength" of the State's evidence. R. 15-13 at 96. The memo also stated "Petitioner was also again advised that he was charged with 4 Class X Felonies that carry 6-30 years each at 85%. He was advised that they could

be served consecutively . . . ." *Id.* The memo then described that they told Petitioner that "if he were to be found guilty of 2 class X felonies and if they were to be served consecutively that he would be serving 12 years at 85% which would be greater than the maximum that he could serve on a Class 1 at 50%." *Id.* Ultimately, the memo concluded, Petitioner "was very reluctant to consider a non probationable offense, indicating that he would not serve any jail time. He was advised that he would likely receive jail time and even an IDOC sentence if it were a probationable offense that he pled guilty to." *Id.*

Petitioner offered a different version of events as to the July 16, 2009 meeting. He admitted that his attorneys informed him that the State would not agree to an offer that included only probation. R. 1 at 22. But he claimed they did not disclose that the sentence on a Class 1 offense could be served at 50% while a Class X felony sentence must be served at 85%, or that the underlying charges were non-probational offenses. R. 15-11 at 4289–90, 4293, 4308. He also claimed that his attorneys never discussed his sentencing exposure to the Class X felonies or that they required consecutive sentences. *Id.* at 4292–93. According to Petitioner, neither Samuels nor Halverson advised him to take the offer, but they told him it was a "good offer" without further explanation. *Id.* at 4301–02. He averred that if he had been fully informed of his potential sentencing exposure, he would have accepted the prosecution's offer. R. 1 at 22.

Petitioner's father testified that Samuels told him he sought a plea offer from the State that included no jail time. R. 15-11 at 4240–41. He therefore did not want

Petitioner to accept the State's initial offer because "it was ingrained in [his] mind . . . that [Petitioner] was . . . not going to jail." *Id.* at 4256. He discussed the offer with Petitioner, who said, "I'm not supposed to do any jail time . . . . I'm supposed to be able to get probation or whatever; I don't want to accept this." *Id.* at 4257. Petitioner's father participated in portions of the plea deal meeting via telephone and stated he did not hear Samuels or Halverson discuss Petitioner's sentencing exposure. *Id.* at 4258.

Petitioner testified that the first time he learned of his true sentencing exposure was after he had already been found guilty after the first trial, and that, by this time, his minimum sentence was 24 years in prison. *Id.* at 4295–96, 4306. During his first sentencing hearing, the court explained to Petitioner that the sentences for predatory criminal sexual assault of a child are "mandatorily consecutive" and are not eligible to be served at 50%, but rather, 85%. R. 15-10 at 2490, 2576. Petitioner continued to retain Samuels and Halverson through the successful direct appeal and initially for the retrial. R. 15-11 at 4297.

Upon remand from the Illinois Appellate Court, in September 2012, the State offered to recommend a 25-year sentence in exchange for a guilty plea, but Petitioner testified he rejected the offer because it did not provide him credit for time served. *Id.* at 4299–4300. When he fired Samuels and Halverson and hired Brundage as his attorney, he told Brundage he would accept another plea offer if the prison term was 20 years or less—an offer he never received. *Id.* at 4299.

### ii.  State Court Rulings on Post-Conviction Petition

On the basis of the testimony at the evidentiary hearing, the post-conviction court denied Petitioner's post-trial petition, finding Samuels's and Halverson's testimony to be credible and Petitioner's testimony to be not credible and evasive. *Id.* at 4357, 4359. Specifically, it found that the evidence showed that, at the July 16, 2009 meeting, Halverson told Petitioner that he was facing mandatory consecutive sentences, and that Petitioner turned down the initial plea deal because he was "totally unreceptive . . . to any disposition that involved the penitentiary." *Id.* at 4353, 4356. The court further found that Samuels initially told Petitioner that probation was on the table only because Petitioner had initially downplayed the evidence against him. *Id.* at 4352.

The Illinois Appellate Court, applying *Strickland v. Washington*, 466 U.S. 668, 694 (1984), also rejected Petitioner's ineffective assistance of counsel claim, finding neither ineffective assistance nor prejudice. R. 15-3. The appellate court upheld the post-conviction court's findings that Halverson informed Petitioner that he faced mandatory consecutive sentencing, and that Petitioner could not override the court's findings with his own "subjective self-serving testimony." *Id.* ¶ 22 (citing *People v. Hale*, 996 N.E.2d 607, 614 (Ill. 1997). It also rejected Petitioner's emphasis on the wording of the December 2009 memo, which stated that his attorneys had informed him that the sentences for Class X convictions "*could* be served consecutively." The appellate court explained that it "need not parse the memo for hidden meanings" given that the lower court's decision rested on Samuels's and Halverson's testimonies and not the memo. *Id.* ¶ 22. The appellate court further found a lack of prejudice

because Petitioner was "adamant" that he would not accept any plea offer that included a prison sentence, and that his decision was therefore not driven by his attorneys' advice, but by other considerations. Indeed, the appellate court noted that, even without consecutive sentencing, Petitioner faced a possible 30-year sentence if he were convicted of a single Class X offense. *Id.* Even so, if Petitioner had accepted the plea offer, he did not prove that the trial court would have accepted it. *Id.* ¶ 26.

### B. Analysis

The two-part standard articulated by the Supreme Court in *Strickland* governs claims for ineffective assistance of counsel during plea negotiations. *Lafler v. Cooper*, 566 U.S. 156, 162 (2012). To succeed on such a claim, a petitioner must show that his lawyer's representation (1) "fell below an objective standard of reasonableness" (performance prong); and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (prejudice prong). *Strickland*, 466 U.S. at 688, 694. The *Strickland* analysis begins with "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Because the *Strickland* standard is "highly deferential" to a lawyer's strategic choices and the review of state-court judgments under § 2254(d) is "likewise highly deferential," the Court's review here is "doubly deferential." *Hinesley v. Knight*, 837 F.3d 721, 732 (7th Cir. 2016). The question, therefore, is "not whether counsel's actions were reasonable," but rather "whether there is *any* reasonable argument that counsel satisfied *Strickland*'s

deferential standard." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (emphasis added).

### i. Performance Prong

In the context of a claim of ineffective assistance counsel for deficient advice while considering a plea agreement, the Seventh Circuit has provided some minimum criteria for objectively reasonable representation. The attorney must "attempt to learn all of the facts of the case, make an estimate of the likely sentence, and communicate the result of that analysis." *Julian v. Bartley*, 495 F.3d 487, 495 (7th Cir. 2007) (citations omitted). According to the state post-conviction and appellate courts, Samuels and Halverson did just that. They credited Halverson's testimony that, consistent with his usual practice during his initial client meetings, he informed Petitioner of his potential sentence and that the Class X felonies' sentences would be mandatorily consecutive. And both Samuels and Halverson testified that, during the July 16, 2009 meeting, they described Petitioner's potential sentencing exposure, informed him he was subject to mandatory consecutive sentences on his Class X felonies, and discussed hypothetical situations should he proceed to trial compared to the State's plea offer.

But Petitioner argues that the state courts' findings were based on an unreasonable determination that Samuels's and Halverson's testimonies in the evidentiary hearing were credible, and that Petitioner's was not. First and foremost, this Court does not have the ability, on *habeas* review, "to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by [this

Court]." *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983). Even where "[r]easonable minds reviewing the record might disagree about [a witness's] credibility," that "does not suffice to supersede the trial court's credibility determination." *Rice v. Collins*, 546 U.S. 333, 341–42 (2006). Petitioner must therefore show that the state court's decision was "so inadequately supported by the record as to be arbitrary and therefore objectively unreasonable." *Alston v. Smith*, 840 F.3d 363, 370 (7th Cir. 2016) (citations omitted). Petitioner does not do so here.

Petitioner argues that the December 2009 memo undermines Samuels's and Halverson's credibility and demonstrates that they failed to tell him he was potentially subject to mandatory consecutive sentences. He makes much of the conditional phrases "*could* be served consecutively" and "*if* they were to be served consecutively," in the memo. He claims they demonstrate that Samuels and Halverson did not tell him the Class X felonies were mandatorily consecutive. He also contends that the memo, which was created more contemporaneously with the July 2009 meeting than the evidentiary hearing ten years later, should be given more weight than Samuels's and Halverson's later testimony, which he claims is unreliable and contradictory.

But the memo largely corroborates Samuels's and Halverson's testimonies. It stated that they had advised Petitioner to accept the plea deal because he was likely to receive a prison sentence and because the evidence against him was strong. And it memorialized that Samuels and Halverson mentioned at least twice the consecutive nature of the potential sentence Petitioner could face. Though the memo does not

28

mention that they informed Petitioner that consecutive sentences on the Class X felonies are *mandatory*, the use of the words "could" and "if" do not contradict that possibility, especially given that Halverson testified that the conditional wording of the memo was meant to be hypothetical (as in, *if* Petitioner were found guilty of the Class X felonies, he would face consecutive sentencing). R. 15-11 at 4214–15. Even so, ambiguous wording in the memo does not constitute the clear and convincing evidence needed to overcome the state courts' credibility determinations.

But even if Petitioner's attorneys' advice to him during the July 16, 2009 meeting conformed exactly to the wording contained in the memo, Petitioner still cannot satisfy the performance prong of the *Strickland* analysis. Though a mistake is not in and of itself proof of deficient performance, and an attorney "need not be 100% correct" in his analysis of the consequences of pleading guilty versus going to trial, a gross mischaracterization of the law may constitute deficient performance. *Julian*, 495 F.3d at 495 (citations omitted). If Petitioner's attorneys at least informed him that he *could* be subject to consecutive sentences, his potential maximum sentence exposure was still the same. That would not be a "gross mischaracterization" of the law that would rise to the level of constitutional deficiency.

Petitioner also highlights minor inconsistencies in Samuels's and Halverson's testimonies during the evidentiary hearing which he claims undermine their credibility. But all these minor inconsistencies can be explained away by the vagaries of memory over ten years. For example, Petitioner highlights Samuels's recollection that Petitioner was initially charged with four Class X charges of "aggravated

criminal sexual abuse," when he was actually charged with predatory criminal sexual assault. The mistake of forgetting the precise, legal name of the charges is of no moment—Samuels remembered correctly that Petitioner was charged with four Class X sex-crime-based charges. Petitioner also points out that Samuels originally testified that he did not refer Petitioner for sex offender treatment, but he actually did, and admitted to such when he was shown documents confirming it. Again, this is a minor point that can be easily forgotten ten years after the fact by someone who has represented thousands of criminal defendants. The same can be said about Halverson's and Samuels's conflicting testimonies about the origin and purpose of the December 2009 memo. Finally, Petitioner argues Samuels's testimony about the July 2009 meeting is not credible because he testified the child pornography charges were pending during the meeting and he mentioned them as a reason to accept the plea offer, when those charges were not filed until two months after that meeting. What Petitioner does not mention is that, as far back as January 2009, seven months before the meeting, Samuels was aware that the State had found evidence of child pornography on Petitioner's computer and that charges were likely imminent. R. 15-12 at 9 (prosecutor informing the trial court and defense counsel during a status hearing that investigators had found evidence of child pornography on Petitioner's computer). It therefore makes sense that Samuels mentioned that evidence during the July 2009 meeting. In the end, none of the inconsistencies pointed out by Petitioner come close to establishing that the state courts' determinations of

credibility were "arbitrary and therefore objectively unreasonable." *Alston*, 840 F.3d at 370.

### ii. Prejudice Prong

Nor can Petitioner establish the appellate court was wrong on the prejudice prong of the *Strickland* analysis. He argues there is sufficient evidence he would have accepted the State's initial plea offer but for his attorneys' erroneous advice. After his first conviction was reversed on appeal, for example, Petitioner informed Brundage, his new attorney, that he would accept a plea offer for a sentence up to 20 years. Petitioner claims that this was because he was at that point aware of the requirement that sentences on Class X felonies run consecutively.

Petitioner's statement to his attorney on remand that he would accept up to 20 years is not sufficient evidence to establish that he would have accepted the State's initial plea offer. For starters, he made this statement after he had already been convicted by a jury of all four Class X felonies and faced over forty years in prison (but for the appellate court's reversal). This sobering experience, which surely demonstrated to him the true risk of failing to accept a plea offer, would of course cause him to reevaluate his expectations. Further, Samuels, Halverson, and Petitioner's father all testified that, at the time of the State's first plea offer, Petitioner was "adamant" about not accepting any prison time, and that this is what he based his decision on. He may have hoped that he would receive probation (and at one time been told by his attorney, based on his own lies, that he was a good candidate for it). But even if the sentences were concurrent, as Petitioner apparently thought

31

they were, he still would have turned down the deal knowing that he faced a potential sentence of 30 years, as he had been informed by the trial court during his initial hearing. Petitioner has therefore not shown that the appellate court's factual findings on prejudice were against the clear and convincing weight of the evidence.

## III. Certificate of Appealability

Under the AEDPA, a certificate of appealability "may not issue 'unless the applicant has made a substantial showing of the denial of a constitutional right.'" *Slack v. McDaniel*, 529 U.S. 473, 483 (2000) (quoting 28 U.S.C. § 2253(c)). This requires the petitioner to demonstrate that reasonable jurists could debate whether this Court should have resolved the petitioner's claims differently or that the issues were "adequate to deserve encouragement to proceed further." *Arredondo v. Huibregtse*, 542 F.3d 1155, 1165 (7th Cir. 2008) (citing *Slack*, 529 U.S. at 484) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).

Whether the trial court's procedure to close the courtroom during Petitioner's first trial implicated the requirements of *Waller*, 467 U.S. at 47–48, given the "highly objectionable" nature of the procedure (according to the state appellate court) and its similarity to the facts of *Globe*, 457 U.S. at 610–11, is a close question such that reasonable jurists could debate whether this Court should have resolved the issue differently. The Court grants a certificate of appealability as to his Sixth Amendment claim only. *See Lavin v. Rednour*, 641 F.3d 830, 832 (7th Cir. 2011) (citing *Slack*, 529 U.S. at 484–85; *Davis v. Borgen*, 349 F.3d 1027, 1029 (7th Cir. 2003)) ("To receive certification under § 2253(c), the prisoner must show that reasonable jurists would

32

find the district court's assessment of the constitutional claim and any antecedent procedural rulings debatable or wrong."). The certificate of appealability is limited to this single issue, and the Court declines to issue a certificate of appealability for Petitioner's ineffective assistance of counsel claim as Petitioner cannot make the requisite showing.

## Conclusion

For the foregoing reasons, Petitioner's 28 U.S.C. § 2254 Petition is denied, and a certificate of appealability is granted as to his Sixth Amendment public trial claim.

.

ENTERED:

_Thomas M Durkin_

Honorable Thomas M. Durkin
United States District Judge

Dated: July 28, 2023